**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**ROBERT A. BATES,**

        **Plaintiff,**

**v.**                                     **Civil Action No. 3:16-cv-00133-HEH**

**LUNDY MOTORS, LLC,**
**WYNN'S EXTENDED CARE, INC.,**
**NATIONAL CASUALTY COMPANY, and**
**PHOENIX AMERICAN WARRANTY COMPANY, INC.,**

        **Defendants.**

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS

### I. Procedural Context for Defendants' Motions

All Defendants have filed motions to compel arbitration pursuant to the arbitration clause in the service contract in issue. (Doc. 6 and Doc. 13). The complete text of the arbitration clause that all Defendants seek to enforce can be found in the Exhibits proferred by Defendants that include the complete service contract. (Doc. 8-1 and Doc. 12-1). Plaintiff was unable to attach this complete document with his Complaint because Plaintiff had access only to the first two pages of this document.

After the filing of Defendants' Motions, Plaintiff's counsel attempted to resolve the pending matter by the proposal set forth in the email attached as Exhibit 1. In response, Defendants did agree that to arbitration in the Eastern District of Virginia, rather than Orange County, California. Other than that change, Defendants would not agree to further changes in the arbitration process they seek. (Exhibit 2, emails from Kevin Streit and Terry Midkiff). Consequently, Plaintiff's Opposition will address other aspects of the arbitration clause and treat

the venue provision as modified to state "Eastern District of Virginia" rather than "Orange County, California."

As set forth below, Plaintiff asserts two different reasons for why the proferred arbitration clause is unenforceable as to him.  The first is that the arbitration clause improperly waives his rights to have reasonable attorneys' fees awarded under the statutes in issue.  Although the core legal question for this first issue requires no evidence other than the text of the arbitration clause, Plaintiff's argument will address both Plaintiff's financial circumstances and Defendants' refusal to remove this waiver.  The second issue is that the arbitrators' fees under the proferred clause are so far beyond any expense he can afford.  This second issue is dependent on the facts of Plaintiff's financial circumstances and the anticipated fees of a three-arbitrator panel deciding the claims in issues.

For this factual issue Plaintiff will present some evidence with this Opposition (see attached Declaration of Mr. Bates, and Exhibits 3 and 4), and Plaintiff also must estimate the number of hours that three arbitrators would need to decide the claims and the value of his claims.  If the Court requires further evidence of these matters or if any of the Defendants challenge any of these factual assertions, then an evidentiary hearing must be held to determine the contested facts.  Although Plaintiff has requested a jury trial of all contested factual matters in this case, Plaintiff is willing to have any contested factual issues decided either by the Court or by a jury, as long as agreeing to have such issues decided by the Court would not waive Plaintiff's claim to have a jury decide the substantive issues in the case.

**II.     The arbitration clause should not be enforced because Defendants improperly seek to prohibit Plaintiff from receiving the benefit of the fee shifting remedy integral to each of the statutes on which Plaintiff's claims are based.**

Defendants' proffered arbitration clause is not enforceable because it impermissibly bars Plaintiff from the fee-shifting remedy component of the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §1964(c), the Truth in Lending Act (TILA), 15 U.S.C. §1640(a)(3), and the Virginia Consumer Protection Act (VCPA), Va. Code § 59.1-204(B).  As fully explained below, arbitration clauses are not enforceable when the clause bars a plaintiff from accessing the legal remedies that would be available in Court.  In this case, the remedy of fee-shifting is necessary in order for Plaintiff to bring his claims.  If the fee-shifting remedy is not available, Plaintiff will be unable to assert his statutory claims.

**A.** **An arbitration clause that prohibits a plaintiff from accessing the fee-shifting remedy in private attorney general statutes should not be enforced.**

Before a court enforces an arbitration clause, it first must determine whether the clause is valid.  "The FAA confers near plenary authority on an arbitrator to resolve a dispute given to him by an arbitration agreement. For this authority to be validly exercised, however, any agreement purporting to give a dispute over to arbitration must itself be valid. The validity of an arbitration agreement is a "question of arbitrability" and, in the normal course, it "is undeniably an issue for judicial determination." *Peabody Holding Co. v. United Mine Workers of Am., Int'l Union,* 665 F.3d 96, 102 (4th Cir. 2012) (*quoting AT & T Techs., Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986))." *Hayes v. Delbert Servs. Corp*., 811 F.3d. 666, 671 (4th Cir. 2016).

The United States Supreme Court has made clear that arbitration agreements are enforceable when they merely select a forum and do not limit statutory rights.  "[F]ederal statutory claims may be the subject of arbitration agreements that are enforceable pursuant to the FAA because the agreement only determines the choice of forum. In these cases we recognized that [b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights

afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *EEOC v Waffle House Inc*., 534 U.S. 279, 307 n.10 (2002)(*citing Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc.,* 473 U.S. 614, 628 (1985); *Gilmer v. Interstate/Johnson Lane Corp*., 500 U.S. 20, 26 (1991). Arbitration clauses that deprive a party of its day in court to assert a claim are not to be enforced. *See Bremen Bh v. Zapatacompany*, 407 U.S. 1, 18 (1972)(cited approvingly by *Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc*., 473 U.S. 614, 632 (1985)).

Arbitration agreements that waive a party's legal remedies are to be struck down. "We merely note that in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." *Mitsubishi Motors Corporation,* 473 U.S. 637, n.19. When the arbitration process does not "allow for effective vindication" of Plaintiff's claims, the arbitration agreement is not enforceable. *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 385 (6th Cir. 2005) (citing *Floss v. Ryan's Family Steak Houses, Inc*., 211 F.3d 306, 313 (6th Cir. 2000); *Graham Oil Co. v. ARCO Products Co., a Div. of Atlantic Richfield Co.*, 43 F.3d 1244, 1248 (9th Cir. 1995) ("Because the arbitration clause employed by ARCO compels Graham Oil to surrender important statutorily-mandated rights afforded franchisees by the PMPA, we hold that the clause contravenes the Act.").

Using close examination of United States Supreme Court jurisprudence, the Fourth Circuit has recently explained why an arbitration clause that waives assertion of claims is unenforceable.

Relatedly, the Court has upheld arbitration agreements that contain waivers providing that arbitration is to proceed on an individual rather than a class

action basis, and that impose other procedural requirements on potential claimants. *E.g., Am. Exp. Co. v. Italian Colors Rest.,* 133 S. Ct. 2304, 2312 (2013) (waiver of class arbitration permissible); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 541 (1995) (arbitration in foreign countries permissible); see also *Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 181-83 (4th Cir. 2013) (fee splitting between the parties to an arbitration may be permissible). These decisions flow naturally from the "overarching principle" of the FAA -- "that arbitration is a matter of contract" and, therefore, that "courts must 'rigorously enforce' arbitration agreements according to their terms." *Am. Exp. Co.*, 133 S. Ct. at 2309 (quoting *Dean Witter Reynolds Inc.*, 470 U.S. at 221).

Yet while the Court has affirmed that the FAA gives parties the freedom to structure arbitration in the way they choose, it has repeatedly cautioned that this freedom does not extend to a "substantive waiver of federally protected civil rights" in an arbitration agreement. *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273 (2009). In its *American Express* decision, the Court first acknowledged that the prohibition of substantive waivers of federal rights may prevent the imposition of "large arbitration costs [that] could preclude a litigant . . . from effectively vindicating her federal statutory rights." *Am. Exp. Co.*, 133 S. Ct. at 2311 (alteration in original) (quoting *Green Tree Financial Corp.-Ala. v. Randolph*, 531 U.S. 79, 90 (2000)); see also *Muriithi*, 712 F.3d at 181 (noting that an arbitration clause may be unenforceable if high arbitration costs effectively prevent access to the arbitral forum). But the Court then clarified that the substantive waiver prohibition does not go so far as to guarantee a procedural path that would make proving a federal statutory claim in arbitration "worth the expense involved" for all claimants under all circumstances. *See Am. Exp. Co.*, 133 S. Ct. at 2311-12. Rather, the Court explained, the primary aim of the prohibition is to "prevent [a] 'prospective waiver of a party's right to pursue statutory remedies.'" Id. at 2310 (emphasis in original) (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 637 n.19). The Court thus upheld the class arbitration waiver in American Express, because the waiver only reduced the economic incentive to bring a federal antitrust claim. It did not prevent a party from pursuing an antitrust claim altogether. In fact, the Court stated that the rule against substantive waivers "would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights." *Id.*

*Hayes v. Delbert Servs. Corp.*, 811 F.3d. at 674-75.

When an arbitration clause prohibits recovery of attorneys' fees, it should not be enforced against statutory claims that provide a fee-shifting remedy. Regarding an attorney fee-shifting and punitive damage restriction in an arbitration clause that an employer attempted to apply to a claim under the Virgin Islands Wrongful Discharge Act, the Third Circuit concluded that "[t]hese restrictions are one-sided in the extreme and unreasonably favorable to Anthony Crane.

They prevent an employee from recovering not only his or her attorney's fees but also such potentially significant relief as punitive damages." *Alexander v. Anthony Int'l, Ltd. P'ship*, 341 F.3d 256, 267 (3d Cir. 2003) (refusing to enforce arbitration clause).   The Seventh Circuit cited an improper waiver of the fee-shifting provision of the Petroleum Marketing Practices Act (PMPA) in refusing to enforce an arbitration agreement.   *See Graham Oil Co. v. ARCO Products Co.*, 43 F.3d 1244, 1247 (9th Cir. 1994).   It explained that within the PMPA, the "purpose of attorney's fees is to deter franchisors from improperly contesting meritorious claims" and found that "ARCO violated the purpose as well as the specific terms of the PMPA." *Id* at 1248. Similarly, the First Circuit has concluded that a "ban on the recovery of attorney's fees and costs in the arbitration agreements would burden Plaintiffs here with prohibitive arbitration costs, preventing Plaintiffs from vindicating their statutory rights in arbitration."  *Kristian v. Comcast Corp.*, 446 F.3d 25, 52–53 (1st Cir. 2006)(ultimately using language of the agreement to sever the unlawful restriction) ; *see also Gourley v. Yellow Transp.*, L.L.C., 178 F. Supp. 2d 1196 (D. Colo. 2001) (refusing to enforce arbitration agreement that denies ability to request attorneys' fees under fee-shifting statute because it violates public policy).

Consequently, arbitration clauses that prospectively waive statutory remedies like attorneys' fees are not to be enforced because arbitration under the F.A.A. is intended merely as a different forum to decide legal claims.

**B.   The Plaintiff's claims under the RICO, TILA, and VCPA are private attorney general claims that use fee shifting to accomplish the important purposes of these statutes.**

Courts in the United States recognize that private attorney general statutes use attorney fee-shifting clauses as a means to induce private actions to enforce such statutes.   *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 401-02 (1968).  As explained by Justice Brennan,

> *Newman* interpreted the fee provision of Title II as intended to bridge the gap between the desire of an individual who has been deprived of a federal right to see that right vindicated and the financial ability of that individual to do so. More importantly, *Newman* recognized that Congress did not erect this bridge solely, or even primarily, to confer a benefit on such aggrieved individuals. Rather, Congress sought to capitalize on the happy coincidence that encouraging private actions would, in the long run, provide effective public enforcement of Title II. By ensuring that lawyers would be willing to take Title II cases, Congress made the threat of a lawsuit for violating Title II real, thereby deterring potential violators.

*Evans v. Jeff*, 475 U.S. 717, 747 (1986) (Brennan dissent).

In *Alyeska Pipeline Service Company v. Wilderness Society*, 421 U.S. 240, 247- 268 (1975), the United States Supreme Court extensively reviewed the history of fee-shifting in American jurisprudence, and held that a successful plaintiff in a federal claim could only pursue an award of attorney's fees under a private attorney general theory when authorized by Congress.

> It is true that under some, if not most, of the statutes providing for the allowance of reasonable fees, Congress has opted to rely heavily on private enforcement to implement public policy and to allow counsel fees so as to encourage private litigation. Fee shifting in connection with treble-damages awards under the antitrust laws is a prime example; cf. *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 265—266, 92 S.Ct. 885, 892—893, 31 L.Ed.2d 184 (1972); and we have noted that Title II of the Civil Rights Act of 1964 was intended 'not simply to penalize litigants who deliberately advance arguments they know to be untenable but, more broadly, to encourage individuals injured by racial discrimination to seek judicial relief under Title II.' *Newman*, *supra*, 390 U.S., at 402, 88 S.Ct., at 966 (footnote omitted). But congressional utilization of the private-attorney-general concept can in no sense be construed as a grant of authority to the Judiciary to jettison the traditional rule against nonstatutory allowances to the prevailing party and to award attorneys' fees whenever the courts deem the public policy furthered by a particular statute important enough to warrant the award.

*Id.* at 263.

Like fee-shifting provisions, the Fourth Circuit has explained that statutory damages, similar to those found in the RICO, TILA, and VCPA, are to encourage the public to act as a private attorney general.

> The $1,000 statutory damage award specified in I.R.C. § 7431(c)(1)(A), is included for the benefit of taxpayers. Actual damages for the invasion of privacy that occurs when tax returns are wrongfully disclosed can be hard to quantify. In order to encourage taxpayers to act as "private attorneys general" and pursue suits against the IRS for violations of I.R.C. § 6103, Congress enacted the statutory damages provision to ensure that in meritorious cases of wrongful release a taxpayer would not walk away from the courthouse empty-handed for failure of proving damages. See generally, *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 222 n. 14 (4th Cir.1978) (explaining the purpose of statutory damages).

*Scrimgeour v. Internal Revenue*, 149 F.3d 318, 328 n.11 (4th Cir. 1998) (*Barber* is a Truth in Lending Act claim). Similarly, other federal Courts of Appeal have recognized that the statutory damages and fee-shifting provisions of consumer protection statutes make them private attorney general claims. Regarding the TILA and two other statutes within the federal Consumer Credit Protection Act, the Seventh Circuit explained that "[t]he attorney for the plaintiff is made a private attorney general, compensated for bringing suits that while they may not yield a tangible recovery for the client operate to deter violations by imposing a cost on the defendant even if his misconduct imposed no cost on the plaintiff. A number of the cases describe all three statutes in just this way. *See Tolentino v. Friedman, supra*, 46 F.3d at 651-52 (FDCPA); *Begala v. PNC Bank*, 163 F.3d 948, 950 (6th Cir. 1998) (TILA); *Jesus v. Banco Popular de Puerto Rico*, supra, 918 F.2d at 234 (TILA); *Rodash v. AIB Mortgage Co.*, 16 F.3d 1142, 1144 (11th Cir. 1994) (TILA); *Bryant v. TRW*, Inc., 689 F.2d 72, 79 (6th Cir. 1982) (FCRA)." *Crabill v. Trans Union L.L.C.*, 259 F.3d 662, 666 (7th Cir. 2001).

Private attorney general statutes, like the TILA use the private attorney general function of fee-shifting and statutory damages "to deter generally illegalities which are only rarely uncovered and punished, and not just to compensate borrowers for their actual injuries in any particular case." *Fairley v. Turan-Foley Imports, Inc.*, 65 F.3d 475, 480 (1995) (quoting *Williams v. Public Fin. Corp.*, 598 F.2d 349, 356 (5th Cir.1979)); *see also Drew v. Flagship First Nat.*

*Bank of Titusville*, 448 F.Supp. 434, 436 (M.D. Fla., 1977).  Similarly, the Fifth Circuit has also stated that "TILA is designed to create enforcement through a system of private attorneys general." *Edwards v. Your Credit Inc*., 148 F.3d 427, 432 (5th Cir. 1998)(citing *McGowan v. King, Inc*., 569 F.2d 845, 848 (5th Cir.1978).

Consequently, a central remedy and means of enforcement for the RICO, TILA, and VCPA is the fee-shifting provision found at 18 U.S.C. §1964(c), 15 U.S.C. §1640(a)(3), and Va. Code § 59.1-204(B).  Congress and the Virginia General Assembly each provided for this fee-shifting provision to encourage private enforcement of these statutes.  As shown by Plaintiff's Declaration, he cannot afford to pay a lawyer out of his own pocket to raise his claims, and his Complaint seeks the remedy of fee-shifting that is provided for by these statutes.

### C.     The Defendants' clause impermissibly waives the important attorney-fee shifting remedy of the statutes in issue, and enforcement of it would prohibit Plaintiff from asserting his claims.

Defendant seeks to enforce an arbitration clause that unambiguously waives Plaintiff's rights under the RICO, the TILA, and the VCPA to request fee shifting.  It states "Each party shall pay the fees of its own attorneys, the expenses of its witnesses, and all other expenses connected with the presentation of the case."  When Plaintiff objected to this provision as an improper waiver of the statutory fee-shifting remedy and requested that the agreement be modified so as to allow "all remedies allowed by law" to be pursued, Defendants refused.  Thus, Defendants' arbitration clause prohibits the arbitrator from awarding all the relief allowable under these private attorney general statutes.  Because such a waiver is improper, the clause cannot be enforced.

In addition to not allowing all the relief that these private-attorney-general statutes use to accomplish their purposes, enforcement of the clause would prohibit Plaintiff from pursuing any

of his claims.  As shown by his Declaration, he has extremely limited income and currently regularly borrows from friends and relatives to make ends meet.  He could not afford to pay lawyers to take his case and pursue his claims.  Consequently, enforcing a waiver of his right to the attorneys' fees would have the very real effect of leaving him with no ability to bring these claims in any forum.

As an additional matter, Lundy also quotes part of a different arbitration agreement embedded in the credit contract it sold to Credit Acceptance Corporation.  Without any analysis of which of these competing arbitration agreements should be applied, Lundy appears to assert that the TILA claim should be subject to one arbitration clause, and the other two claims subject to a different arbitration agreement.  The arbitration agreement in the credit contract suffers from the same defect as the one in the service contract because by its specific terms it states: "neither You nor We may act as a private attorney general in court or in arbitration."  Lundy also ignores the language of the service contract which on Page 4 states that it supercedes any and all prior and contemporaneous agreements.  Furthermore, it specifically contemplates the possibility of conflicting arbitration clauses and identifies when to look to the credit contract.  Regarding any dispute "arising out of or relating to" the service contract, an arbitration agreement in credit contract will control "[i] in the event a dispute is brought between the Lienholder and the Vehicle owner, and the Administrator is made a party to that arbitration . . . ."  This case is not a dispute between Plaintiff and the Lienholder, and thus the arbitration agreement in the service contract controls.

Because it improperly prohibits the arbitrator from awarding an important statutory remedy provided for in each of Plaintiff's claims, the arbitration clause in the service contract cannot be enforced against Plaintiff's RICO, TILA, and VCPA claims.  Consequently, because

the Defendants seek to impose an arbitration process that would deny Plaintiff the ability to access the fee-shifting remedy component of these private-attorney-general statutes, their motions should be denied.

## III.  The Defendants' arbitration clause should not be enforced because its allocation of the costs of arbitration would prohibit Plaintiff from bringing his claims.

### A.  An arbitration clause is not enforceable when the evidence shows that the cost of the arbitration would prohibit the plaintiff from accessing the forum.

An arbitration clause is not enforceable if it effectively bars plaintiffs from pursuing their claims.   The United States Supreme Court has authorized mandatory arbitration for statutory claims, but only "so long as the prospective litigant *effectively* may vindicate [her] statutory cause of action in the arbitral forum." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 637 (1985) (emphasis added).  "[I]t is undisputed that fee splitting can render an arbitration agreement unenforceable where the arbitration fees and costs are so prohibitive as to effectively deny the employee access to the arbitral forum." *Bradford v. Rockwell Semiconductor Sys.*, 238 F.3d 549, 553 (4th Cir. 2000).

To determine whether the fees of arbitration fees are too expensive "the appropriate inquiry is one that evaluates whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation, i.e., a case-by-case analysis that focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims." *Id.* at 556.  In rejecting a per-se rule to be applied in all instances, the Fourth Circuit explained how the Supreme Court jurisprudence on this issue requires the party objecting to arbitration to bear the burden of proving the cost barrier.

> Our conclusion that the proper inquiry is a case-by-case analysis rather than a per se rule is bolstered by the Supreme Court's recent decision in *Green Tree*

*Financial Corp.-Alabama v. Randolph,* 121 S. Ct. 513 (2000). In Green Tree, the Court addressed "whether an arbitration agreement that does not mention arbitration costs and fees is unenforceable because it fails to affirmatively protect a party from potentially steep arbitration costs." Id. at 517. In resolving this question, the Court recognized that "[i]t may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum." *Id.* at 522. The Court noted, however, that "the record does not show that Randolph will bear such costs if she goes to arbitration. Indeed, it contains hardly any information on the matter." Id. Accordingly, the Court stated that

> [t]he record reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable. The "risk" that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement. To invalidate the agreement on that basis would undermine the liberal federal policy favoring arbitration agreements. It would also conflict with our prior holdings that the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration.

*Id*. (internal quotation marks and citations omitted and emphasis added). The Court further stated that "[w]e have held that the party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue. Similarly, we believe that where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs. Randolph did not meet that burden." *Id.* (internal citations omitted). In other words, the Green Tree Court rejected Randolph's argument because Randolph could not satisfy her burden of establishing that she was likely to incur prohibitive costs that would deter her from arbitrating her claims. We believe that the Green Tree Court's focus on each individual claimant's "burden of proving that the claims at issue are unsuitable for arbitration," its emphasis on Randolph's inability to show that she was in fact likely to incur prohibitive costs, and its refusal to nullify the arbitration agreement based upon an abstract and speculative risk that the claimant might, under some circumstances, incur prohibitive costs, is significant. *Id.* The Green Tree Court's refusal to accept the speculative risk that a claimant might incur prohibitive costs undermines the rationale of those courts that would impose a per se prohibition against an arbitration provision that might impose prohibitive costs against an individual on the theory that any such risk of prohibitive costs, even if that risk is entirely uncertain, surely deters the bringing of arbitration.

*Id.* at 556-57.

Consequently, the simple presence of a fee-splitting provision in an arbitration clause will not make it unenforceable.   *See Muriithi v. Shuttle Exp., Inc*., 712 F.3d 173, 181-83 (4th Cir. 2013) (fee splitting between the parties to an arbitration allowed).   The party objecting to arbitration bears a "substantial burden" of showing what arbitration would cost if the agreement were enforced. *See id.* (enforcing arbitration agreement because plaintiff "plainly did not offer evidence regarding the arbitrator's fees likely to be incurred in the resolution of the present dispute").   Additionally, under the prohibitive costs analysis, some showing must be made of the estimated value of the claim. *Id.*

Finally, when facts are in dispute about an arbitration clause, the Court must conduct a factual inquiry on which it can rule.   For such a process, the standard to be applied "is akin to the burden on summary judgment." *Chorley Enters. v. Dickey's Barbecue Rests., Inc*., 807 F.3d 553, 564 (4th Cir. 2015).   When the facts are contested, the Court should hold a hearing into the facts.

> The FAA states that, in any suit brought in federal court on any issue referable to arbitration, "upon being satisfied that the issue involved in such a suit ... is referable to arbitration [the court] shall stay the trial." 9 U.S.C. § 3 (emphasis added). The Supreme Court has interpreted this as calling for a hearing with a restricted inquiry into factual issues. *See Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 22, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

> Where the parties contest the enforceability of an agreement and an evidentiary hearing is necessary to determine whether a contract is valid, as in the present case, the court would be remiss not to hold a hearing. This case has raised a myriad of complex problems that the court has labored to resolve. The Magistrate, recognizing that such a situation was present, was proper and responsible to hold the October 15, 1999 hearing in this case.

*Pitchford v. Oakwood Mobile Homes, Inc.*, 124 F.Supp.2d 958, 961 (W.D. Va. 2000).

Prior to an evidentiary hearing of any contested facts, discovery on the contested facts should be allowd. "[O]ne important purpose of discovery is to disclose all relevant and material evidence before trial in order that the trial may be an effective method for arriving at the truth

and not "a battle of wits between counsel." *Hickman v. Taylor*, 329 U.S. 495, 516, 67 S.Ct. 385, 396, 91 L.Ed. 451 (1947) (Jackson, J., concurring); *see* Frost, The Ascertainment of Truth by Discovery, 28 F.R.D. 89 (1961)." *Guilford National Bank of Greensboro v. Southern Ry. Co.*, 297 F.2d 921, 925 (4th Cir. 1962). Rules of discovery promote the "interest of discovering the truth and insuring a just result in civil litigation, this latter consideration is paramount." *Kline v. Martin*, 345 F.Supp. 31, 32 (E.D. Va. 1972). As was recently done by Judge Urbanski in *Davis v. Lendmark Fin. Servs*., 2016 U.S. Dist. Lexis 31988 (W.D. Va. March 11, 2016), discovery is properly conducted on contested factual issues.

**B.    Because of Plaintiff's financial condition and the value of his claims, the costs he would face under the Defendants' arbitration clause would prohibit him from pursing his statutory claims.**

As shown by his Declaration, Plaintiff has no money available to him to pay arbitration fees. He works as a pizza delivery driver and lives with his father. Because of his current transportation problems, he now makes less money than his normal monthly expenses. He receives supplemental assistance from the state and borrows money from friends and family. He has less than $400 to his name, and must by medicine and pay insurance each month.

Defendants are insisting that arbitration occur before a panel of three arbitrators. Although Defendants state they would agree to use JAMS as an arbitration provider, the JAMS Consumer Protocols, JAMS would not conduct this arbitration because it would burden Plaintiff with more fees than the cost of filing in court. (See Exhibit 3). As instructed by the Fourth Circuit in *Muriithi*, Plaintiff's counsel investigated the hourly rate of arbitrators in Eastern District of Virginia. Attached as Exhibit 4 are the rate sheets for McCammon Group and for Juridical Solutions PLC. Based on these rates, the hourly rate for a panel of three arbitrators is $200 to $400 per hour. Consequently, each hour of an arbitration hearing will cost $600 to

$1200 per hour, and the arbitrators will of course be required to prepare for the hearing, rule on any motions, spend time discussing the issues between themselves, and spend time writing an opinion. Whether the Defendants will seek the equivalent of a substantive motion, whether for dismissal or for summary judgment or both, is unknown to Plaintiff; such procedures would cause even more time to be incurred by all arbitrators. Given the legal issues that would need to be researched and ruled upon by the panel under the RICO and the TILA, including Lundy Motors' affirmative defense of bona fide error, Plaintiff estimates that each member of the panel will ultimately spend 40 hours on this matter. Consequently, the expected fees for arbitration by a panel of three would range between $24,000.00 to $48,000.00.

The Defendant's arbitration provisions require that these fees be split equally between the parties. The agreement does not specify whether for its purposes "parties" means Plaintiff on one side and all the Defendants on the other side (a 50/50 split) or equally among all the parties to case such that party in this instance would bear 20% of the cost. Furthermore, the agreement is silent on what happens if one party succeeds on a substantive motion, such as a Motion to Dismiss, but presumably that party would bear no further cost. Consequently, even Plaintiff's initial share of the fees was 20%, it could quickly increase prior to the arbitration hearing. Therefore, Plaintiff estimates that under the arbitration provision, he could incur fees of $4,800.00 at the low end (assuming the lowest hourly rate arbitrators and his share is 20% of the total for the entire time) to $24,000.00 (assuming the higher hourly rate arbitrators and his share being 50%). If this matter stays in court, Plaintiff would have no responsibility for paying for his case to be decided.

Regarding the potential value of Plaintiff's claims, all turn on the simple allegation that the sum of the dealer's commission, Wynn's administrative fee, and the amount paid to National

Casualty does not equal amount he was charged for the service contract.  The service contract states this sum will equal $2,050.00 but Plaintiff expects that the sum of these three numbers will be less than $2,050.00.  Although Defendants all deny this allegation, particularly Para. 14, 15, and 16 of the Complaint (Doc. 1), Plaintiff believes that the information stated in Credit Acceptance Corporation's Annual Report (Exhibit C and D to the Complaint) is accurate and that at minimum the sum of the three numbers will be several hundred dollars less than $2,050.00.  Plaintiffs' statutory damages allow for his actual damages to be trebled under the RICO claim and to be trebled under the VCPA claim.  Under the TILA claim his statutory damages are capped at $2,000.00.  Thus, not counting the attorneys' fees remedy discussed above, Plaintiff's claim is worth six times his damages, plus $2,000.00.  The number to be trebled can be more precisely discussed as soon as Defendants reveal the following three numbers:

    a. Lundy's commission;

    b. Wynn's administrative fee; and

    c. the amount sent to National Casualty.

At this time, Plaintiff can only estimate that the sum of a + b + c will be approximately $600.00 less than $2050.00.  Consequently the value of Plaintiff's claims is currently estimated to be $5,600.00 (6 X $600 plus $2,000) but this number could be higher if the sum of the three numbers is less than expected.

    Under *Muriithi*, Plaintiff bears a substantial burden of showing how the fees he would face in arbitration make the process unavailable to him.  Based on the analysis above and the attached evidence, Plaintiff would face an estimated $4,800.00 to $24,000.00 in arbitration fees were the Defendants' clause to be enforced.  He has no ability to pay such fees and the estimated

amount of his potential recovery shows that such fees would be cost prohibitive to pursuing his claims.

Defendants can of course come forward with their own evidence about the estimated cost of arbitrating these matters in front of a panel of three arbitrators, and could precisely identify the damages by providing evidence of Lundy's commission, the administrative fee to Wynn's, and the amount paid to National Casualty.  If Defendants wish to contest any of these facts, Plaintiff requests permission to conduct limited discovery on any of the contested facts prior to an evidentiary presentation on these matters.  Unless contested by Defendants, Plaintiff believes he has met the substantial burden under *Muriithi* of showing the anticipated costs of arbitration are prohibitive, but if the Court would like further evidence, Plaintiff requests discovery be granted on whatever issues need further development.

**IV.    This Court should not redraft or revise the arbitration clause to make it enforceable.**

Under Virginia law a court is not to blue pencil an arbitration clause to make the clause enforceable.

> In order to determine the issue of whether the contract between the parties to arbitrate is enforceable notwithstanding certain unlawful provisions, the court must apply Virginia laws of contract. *See First Options,* 514 U.S. at 944, 115 S.Ct. 1920. A contract shall be considered as a whole when, "by its terms, nature, and purpose it contemplates and intends that each and all of its parts and the consideration shall be common each to the other and interdependent." *Shelton v. Stewart,* 193 Va. 162, 167, 67 S.E.2d 841 (1951) (citations and quotations omitted). However, Virginia law does permit clauses of contracts to be severed from the main contract if the parties manifest the intent that the portions of the contract can survive on their own. *See e.g., Reistroffer v. Person,* 247 Va. 45, 439 S.E.2d 376 (1994) (provision regarding attorney's fees was severable and survived nullified contract); *Vega v. Chattan Assoc.,* 246 Va. 196, 199, 435 S.E.2d 142 (1993) ("Whether contractual provisions are severable is determined from the intention of the parties") (citing *Eschner v. Eschner,* 146 Va. 417, 422, 131 S.E. 800 (1926)).

Virginia courts have also recognized the difference between severing a clause or provision of a contract, and rewriting or "blue penciling" a contract in order to make it enforceable. *See Nida v. Business Advisory System, Inc.,* 44 Va. Cir. 487, 1998 WL 972125, *5 (Va. Cir. Ct. Mar. 2, 1998). Although Virginia courts will look to the intent of the parties to determine severability of clauses or provisions, they will not "blue pencil" a contract to make it enforceable. *See Cliff Simmons Roofing, Inc. v. Cash,* 1999 WL 370247, *1-2 (Va. Cir. Ct. June 4, 1999) (refusing to edit contract by selectively enforcing only those portions permissible by law); *Nida,* 1998 WL 972125 at *5 ("Generally, Virginia courts do not rewrite the parties contract for them"); *Pais v. Automation Products, Inc.,* 36 Va. Cir. 230 (1995) ("[T]his court has not been granted the authority to `blue pencil' or otherwise rewrite the contract, the covenants therefore fail"). Therefore, it is critical to determine whether the Arbitration Agreement at issue is subject to severability or blue penciling.

"The difference between "blue penciling" and severing is a matter of focus. The former emphasizes deleting, and in some jurisdictions adding words in a particular clause. The latter emphasizes construing independent clauses independently." *Roto-Die Co., Inc. v. Lesser,* 899 F.Supp. 1515, 1523 (W.D.Va.1995) (refusing to interpret Virginia law as permitting blue pencil rule). The Arbitration Agreement between Oakwood and Pitchford maintains throughout that the arbitration shall be binding and that it includes any claims on the warranty. There is no isolated clause about either the fact that the parties shall be bound or the inclusion of the warranty. The structure and nature of the Arbitration Agreement indicate that all parts contemplate interdependence. *See Shelton,* 193 Va. at 167, 67 S.E.2d 841. Based on the drafting of the contract on its face, severability is unavailable because there is no particular clause or provision that could be treated independently to cure the conflict with the Magnuson-Moss Act. To the contrary, in order to cure the problems with the Arbitration Agreement, the court would be forced to edit the agreement in one of two ways: the court would have to remove all reference to the warranty or remove all reference to the fact that the arbitration must be binding. As noted above, this form of blue penciling is precisely what Virginia courts consistently have refused to engage in. The court sees the wisdom of the refusal to rewrite the contract between the parties because to do so would be to wreak potential havoc with basic contractual principles, such as mutual assent.

Bearing closely in mind the strong federal preference for arbitration, the court must also follow the statutory directive that arbitration agreements "shall be valid, irrevocable, and enforceable, *save upon such grounds* as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (emphasis added). Because the Arbitration Agreement between the parties is in violation of the Magnuson-Moss Act and can only be cured through blue penciling — a procedure disallowed in Virginia — the agreement is unenforceable.

*Pitchford v. Oakwood Mobile Homes, Inc*., 124 F.Supp.2d 958, 965-66 (W.D. Va. 2000).

The *Pitchford* analysis was relied upon and followed by Judge Lee in *Browne v. Kline Tysons Imports, Inc.*, 190 F.Supp.2d 827, 831-32 (E.D. Va. 2002).

> The Buyer's Order is the only contract that refers to arbitration and it only states "binding arbitration." Kline does not seek to eliminate a clause, it seeks to delete a word within the clause: "binding." The Court finds this to be an impermissible attempt to rewrite the contract at issue. Kline should not be permitted to repudiate the obligation of the clause (the binding nature) yet seek a remedy arising from that same clause (the arbitration itself). Therefore, the Court declines to rewrite the Buyer's Order and mandate non-binding arbitration. The Buyer's Order provides for binding arbitration, Kline's claims under the MMWA are not subject to binding arbitration, therefore, it is beyond this Court's authority to stay such claims."

Courts are reluctant to redraft an arbitration clause to make it enforceable because of the risk of rewarding the party who drafted the impermissible clause.

> Under the contrary approach, an employer "will not be deterred from routinely inserting such a deliberately illegal clause into the arbitration agreement it mandates for its employees if it knows that the worst penalty for such illegality is the severance of the clause after the employee has litigated the matter." Brief of Amicus Curiae EEOC at 14-15 (citation omitted). Our *en banc* decision in *Morrison* made clear that the district court's decision to reject MRM's offer to pay was the proper course. *See Morrison,* 317 F.3d at 676-77; *accord Gourley v. Yellow Transp.,* 178 F.Supp.2d 1196, 1203-1205 (D.Colo.2001) (rejecting employer's offer to waive a contractual cost-splitting provision).
>
> Moreover, MRM's offer was an impermissible attempt to vary the terms of a contract. There was neither a meeting of the minds nor consideration to support such a *post hoc* unilateral amendment of the agreement. *See Popovich v. McDonald's Corp.,* 189 F.Supp.2d 772, 779 (N.D.Ill.2002) (accepting defendant's offer to pay all arbitration costs, contrary to contract, would effectively allow it to unilaterally modify contract).

*Cooper v. MRM Investment Co.*, 367 F.3d 493, 512-13 (6th Cir. 2004).

When arbitration agreements are used in an attempt to overreach, no reason exists to save them. *See Nino v. Jewelry Exch. Inc.*, 609 F.3d 191, 208 (3rd Cir. 2010) ("We conclude, in sum, that the arbitration agreement is procedurally and substantively unconscionable, and that the pervasively one-sided nature of the agreement forecloses any possibility of severing the unfair

provisions from the remainder of the agreement."); *Graham Oil v. Arco Prods. Co.*, 43 F.3d 1244, 1248-49 (9th Cir.1994)("ARCO attempted to use an arbitration clause to achieve its unlawful ends. Such a blatant misuse of the arbitration procedure serves to taint the entire clause. As a leading treatise notes, severance is inappropriate when the entire clause represents an "integrated scheme to contravene public policy." See E. Allan Farnsworth, Farnsworth on Contracts Sec. 5.8, at 70 (1990)."); *Paladino v. Avnet Computer Technologies, Inc.*, 134 F.3d 1054, 1058 (11th Cir. 1998)("This is so because the presence of an unlawful provision in an arbitration agreement may serve to taint the entire arbitration agreement, rendering the agreement completely unenforceable, not just subject to judicial reformation.")(citing, among others *Graham,* and *Stirlen v. Supercuts, Inc.*, 51 Cal.App.4th 1519, 60 Cal.Rptr.2d 138 (1997).

As explained by the Fourth Circuit in *Hayes v. Delbert Servs. Corp*., "It is a basic principle of contract law that an unenforceable provision cannot be severed when it goes the "essence" of the contract. 8 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 19:73 (4th ed. 1993). . . . Good authority counsels that severance should not be used when an agreement represents an "integrated scheme to contravene public policy." Id. (quoting E. Allan Farnsworth, Farnsworth on Contracts § 5.8, at 70 (1990)). We thus decline to sever the provisions here." 811 F.3d at 676.

Plaintiff anticipates that in a Reply Brief one or more of the Defendants may ask that the defects in their proferred clause be rewritten to allow arbitration to be enforced. Regardless of what changes or alterations may be proposed by Defendants in an effort to save the enforceability of their arbitration clause, this Court should decline to blue pencil the agreement. First, as shown by Exhibit 1 and 2, Defendants were put on notice that the arbitration clause improperly waived the fee-shifting remedy of the statutes and also imposed prohibitively high

costs on Plaintiff.  In response, all the Defendants insisted on maintaining the waiver and the fee structure.  Second, taken as a whole, the arbitration agreement shows an effort to make pursuing arbitration too expensive for the ordinary consumer.  It requires three arbitrators, requires the consumer to pay an equal share of the arbitrators' fees, prohibits the consumer from recovering attorneys' fees to pursue such an arbitration, and also prohibits recovery of punitive damages and interest.  No entity should be allowed to use such an overreaching clause to reap the benefit of the claim suppression effects of its language, and then receive the benefit of the Court drafting and enforcing proper language when the clause is challenged.

## CONCLUSION

Because Defendants seek to bar Plaintiff's remedies under private-attorney-general statutes, and because the fees of a three-arbitrator panel would be prohibitively expensive for Plaintiff, sending Plaintiff's claims to arbitration would eliminate both his substantive rights and his ability to even have this matter decided.  Therefore, the Defendants' Motions to Compel Arbitration should not be granted.

Respectfully submitted,
Robert A. Bates
By Counsel

_____/s/_____
By: Thomas D. Domonoske, VSB #35434
461 Lee Avenue
Harrisonburg, VA 22802
(540) 442-7706
tomdomonoske@earthlink.net

Dale W. Pittman, VSB#15673
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
(804) 861-6000
(804) 861-3368 (Fax)

dale@pittmanlawoffice.com

Counsel for Robert A. Bates

## CERTIFICATE OF SERVICE

    I hereby certify that on the 22nd  day of April, 2016, I will electronically file this Opposition with attached Exhibits and Declaration with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

_____/s/_____

Thomas D. Domonoske VSB #35434

461 Lee Avenue

Harrisonburg, VA 22802

540-442-7706
